JjPETTIGREW, J.
In this case, appellant appeals an adjudication declaring her minor child to be in need of care and continuing custody with the State of Louisiana. Finding the evidence sufficient to support the adjudication, we affirm.
FACTS AND PROCEDURAL HISTORY
The record reflects that the State of Louisiana, through the Department of Social Services, Office of Community Services (“State”), first intervened in this case on June 12, 1998, at which time a “report of alleged inadequate food and shelter, dependency and lack of supervision” was received by the State regarding the minor child, AR, a female born on November 12, 1997. The report was investigated by the State and was allegedly validated as to lack of supervision and neglect. The Investigation revealed that appellant had moved four times in a four-month period, was unemployed and had allowed her WIC card to expire. The State worked with the appellant, AR’s mother, through its family services unit for approximately one month. Thereafter, it was determined that it was in AR’s best interest that she be taken into the State’s custody. Accordingly, on July 30, 1998, the trial court issued an instanter order placing AR in the temporary custody of the State. Subsequently, in October 1998, AR was placed with her paternal grandmother, where she remains to date.
A Child In Need Of Care Petition was timely filed by the State alleging that AR’s mother could not “provide for the child’s basic needs” and that AR should be adjudicated as a child in need of care and/or supervision. In answer to the State’s petition, JW, the biological father of AR, without admitting the allegations of the petition, stipulated that “neither he nor [appellant] were responsible enough to take [care] of the child at the time.” The appellant denied the allegations of the petition and requested a specific visitation schedule with AR. An adjudication hearing was held on December 15, 1998, at which time all of the parties, including JW and the maternal grandmother, were represented by counsel. The pertinent testimony adduced at the hearing is summarized below.
|3The first witness to testify at the hearing was AR’s paternal grandmother, SC. According to SC, in June 1998, she received a phone call from AR’s maternal grandmother who informed her that appellant had been sleeping in a tent with AR. SC indicated that the maternal grandmother requested her assistance in getting them out of the tent. SC then called appellant and asked if she could have AR for the weekend. They agreed to meet in the parking lot of a local Winn Dixie store. When appellant and AR arrived, AR was dirty and dressed in only a diaper. There was a bruise on AR’s cheek, which SC *1075 reported to the police as a “safety precaution.” When SC asked appellant where AR’s diapers and formula were, appellant indicated that she had not been able to renew her WIC card. SC later discovered that the one bottle that appellant had given her contained spoiled milk. Although not specifically revealed in the record, this event is apparently what initiated the State’s involvemént in this case.
SC testified that since AR has been in her custody, appellant visits with AR once a week at the State’s office and also has visitation with AR every other weekend from Friday to Saturday at the maternal grandmother’s home. SC indicated that on both occasions when AR returned from the weekend visitation at the maternal grandmother’s home, AR was dressed in only a dress with no socks, shoes or coat on, and her hair was dirty. Also, AR’s breathing machine was dirty (AR had been diagnosed with allergies and was required to undergo breathing treatments four times a day), and the maternal grandmother had failed to return AR’s allergy medicine.
According to SC, both JW and appellant have free access to visit with AR whenever they choose. SC stated that appellant had always been welcome in her home. SC further noted that it was only since the State had placed AR in her custody that there were “bad vibes” between appellant and her. When asked if she had any information regarding whether appellant was unfit as a mother, SC indicated that appellant had “said on numerous oecasion[s] if she had it all over to do again [sic], she wouldn’t have had the baby.”
The trial court next heard from Lydia Hardy, a child protection investigator for the State. Ms. Hardy investigated the original report regarding appellant and AR. According |4to Ms. Hardy, the State confirmed the report of lack of supervision and neglect. During Ms. Hardy’s investigation, appellant admitted to her that she and AR had spent two nights in a tent at a friend’s house. Appellant informed Ms. Hardy that she had been “kicked out” of her mother’s house because her mother’s boyfriend had made sexual advances toward her. Appellant also acknowledged that she had allowed her WIC card to expire because she did not have transportation available. Ms. Hardy indicated that while there was no evidence that appellant had ever physically or sexually abused AR, appellant did not have a stable home or stable income. Ms. Hardy testified that during the time that she was involved with the case, appellant and AR were living with the paternal grandmother, and the State’s family services unit was working with appellant.
When asked if it was by her recommendation that the State took custody of AR, Ms. Hardy indicated that she left the State’s employ before the decision was made to take custody of AR. She testified, however, that she was aware of some of the events leading up to this decision. According to Ms. Hardy, appellant had left the paternal grandmother’s house and placed AR with a family friend in Metairie. The State did a home study on this home in Metairie and determined that it was not an appropriate home for AR. Ms. Hardy had no further information regarding the State’s decision to take custody of AR.
The next witness to testify was the maternal grandmother, AO. At the time of the adjudication hearing, appellant was living with AO. Also living in AO’s home were her six-year old daughter, her fiancé, and her fiancé’s daughter. According to AO, appellant always took care of AR, and it was only when appellant was working that AR was left with responsible sitters. She indicated that there was a close bond between appellant and AR. When asked if she had ever kicked appellant and AR out of her home, AO testified that appellant left because she could not abide by AO’s rules.
Phyllis Chandler, a case manager for the State, also testified regarding her involvement in the case. Ms. Chandler indicated *1076 that when AR was first taken into the State’s custody, appellant told her that she could not parent AR at that time because she did not have a stable place to live and was not employed. In fact, appellant told Ms. Chandler that she planned to go into the Army. Ms. Chandler testified that the State did | Ban informal home study on both the paternal grandmother and maternal grandmother and determined that the paternal grandmother would be better able to care for AR. According to Ms. Chandler, the maternal grandmother had a history with the State’s agency, and the State had previously received information regarding alleged past sexual abuse and substance abuse concerning both the maternal grandmother and appellant. There were also concerns about the number of people living in the maternal grandmother’s home who were not directly related to the family. The State concluded that the paternal grandmother could provide a more stable home for AR.
Ms. Chandler advised the court that since AR was taken into the State’s custody, appellant had been cooperating with the State in that she had been involved in parenting classes and therapy. Appellant also underwent a psychological evaluation. According to Ms. Chandler, appellant had been living with her mother for the last two months and was steadily employed at Books-A-Million. Nonetheless, Ms. Chandler indicated that the State would recommend that until such time as appellant could “get her life organized,” AR should “remain in the care of either grandparent, paternal or maternal.” Ms. Chandler further noted that at the present time, the State’s position was that the paternal grandmother’s home was the best place for AR to live.
Ms. Chandler testified about the visitation problems that had occurred since AR had been placed with the paternal grandmother. She stated that there had been “a lot of bickering back and forth.” She described the overall situation as “chaos,” indicating that there had been allegations by both sides of the family against the other regarding such things as alcohol and drug consumption. According to Ms. Chandler, the situation had “calmed down somewhat,” and the State was working with the family on the visitation schedule.
Also testifying at the adjudication hearing was JW. According to JW, it was not until the State requested that he undergo a paternity test that he became certain that he was AR’s father. He indicated that since that point in time, he has done everything he can to help provide for AR. He buys diapers and formula for AR and also has purchased clothing and furniture for her. He advised the court that when he is not working, he helps | ñhis mother care for AR. JW testified that in his opinion, neither he nor appellant is responsible enough to care for AR at the present time.
When asked if he had ever seen appellant doing drugs, JW responded that on one occasion, appellant and a friend were smoking marijuana in the back room of a house with AR in another room of the house. JW stated that while he has never used illegal drugs, he was hospitalized for a drug overdose that he alleges was brought on by someone putting drugs in his drink while he was out. JW was also hospitalized once for a suicide attempt. He admitted that he does have a drinking problem and has sought counseling and treatment with Alcoholics Anonymous. JW also testified that he has never seen a car seat in the vehicle when appellant and her mother pick AR up for visitation. He acknowledged, however, that he had never reported this to the State.
JW indicated that he and appellant had lived together on three different occasions, both before and after AR was born. According to JW, after AR was born, he was usually the one to get up during the night for the baby’s feedings. Appellant would either sleep through the feedings or tell JW that it was his turn to take care of AR.
Appellant was the final witness to testify at the adjudication hearing. Appellant, *1077 who was sixteen years old when AR was born, admitted that she had used marijuana in the past, but not since before she became pregnant. She indicated that from December 3, 1996, to December 3, 1997, she was on probation through the FINS program and was subjected to random drug screens, all of which she passed. Appellant advised the court that she had not used marijuana since October of 1996, and in fact would voluntarily submit to a drug test now and pass. When asked about a statement that she allegedly made during her psychological evaluation regarding her involvement with other drugs such as speed, cocaine, acid and diet pills, appellant denied ever making such a statement. Appellant also denied not using a car seat when she had AR with her.
With regard to her relationship with JW, appellant testified that he was not around for the first three months after AR was born. JW never offered her any money to help support AR. She indicated that when she and JW were living together, she would ask JW to care for AR during the night and feed her as she had been doing all along on her own.
|7Appellant confirmed that she had been living with her mother for about two months at the time of the hearing. When asked about the allegations that her mother had previously made her leave the home, appellant stated that it was usually a case of her leaving because she did not agree with her mother’s rules. According to appellant, she always had a place to go when she left her mother’s house and never had a problem getting food or clothing for AR.
Appellant was asked if she had ever stated that she wished she had never had AR. She indicated that what she had said was that if she could do it all over again, she would have been more careful and not gotten pregnant. Appellant admitted that she was too young at the time to have a baby, “because [she] had goals that [she] wanted to get accomplished and, with a child, it was going to be harder.”
With regard to her future plans for AR, appellant testified that she had already lined up a daycare for AR to attend while she was working. She further indicated that she had spoken with a recruiter about possibly joining the Army or National Guard Reserves. According to appellant, if she were to join the National Guard Reserves, she would be required to go to boot camp for six weeks, during which time AR would stay with appellant’s mother.
After hearing all of the evidence presented by the parties, the trial court determined that AR was a child in need of care based on lack of supervision and neglect. The court continued AR in the State’s custody and maintained the current custodial placement of AR with the paternal grandmother. Also, the court ordered that appellant undergo weekly drug screens at her cost and that'JW continue to attend AA meetings and have the leader of his group report to the State regarding his attendance at same. A written judgment to that effect was signed by the court on December 15, 1998, and filed into the record on January 6,1999.
|sIt is from this judgment that appellant has appealed assigning the following specifications of error:
1. The trial court abused its discretion in adjudicating the child in need of care where there was insufficient evidence to constitute any ground for a child in need of care adjudication.
2. The trial court abused its discretion in granting a disposition inconsistent with its obligation to impose the least restrictive -disposition consistent with the circumstances of the case, needs of the child and best interest of society.
LAW AND ANALYSIS
Standard of Review:
In cases involving the custody of children, the trial court is vested with a vast amount of discretion. Bagents v. Ba- *1078 gents, 419 So.2d 460, 462 (La.1982). The trial court is in a better position to evaluate the best interest of a child because of its superior opportunity to observe the parties and the witnesses who testified at the trial. In re State Ex. Rel. Thaxton, 220 So.2d 184, 187 (La.App. 1 Cir.1969). As an appellate court, we must afford great deference to the trial court’s decision, not only because of that court’s better capacity to evaluate witnesses, but also because of the proper allocation of trial and appellate functions between the respective courts. Canter v. Koehring Company, 283 So.2d 716, 724 (La.1973). Thus, the trial court’s decision will not be disturbed on review except in the clearest case of abuse of the trial court’s great discretion. Bagents, supra.
We have thoroughly reviewed the record in the instant case and are of the opinion that pursuant to La. Ch.C. art. 606 A(2), the trial court’s decision in adjudicating AR to be a child in need of care, removing her from the custody of appellant, and awarding custody to the State was supported by the evidence. Thus, for reasons more discussed below, the trial court’s decision will not be disturbed by this court. Child in Need of Care Proceeding:
In assignment of error number one, appellant alleges that the evidence was insufficient to constitute any ground for a child in need of care adjudication. Appellant | flargues that the State took custody of AR based solely on her (appellant’s) instability and in anticipation of her not taking proper care of AR. She asserts that this is not sufficient for a finding of a child in need of care. Counsel for both the State and AR argue that the State proved its case by a preponderance of the evidence in that appellant did not have a stable home, she was not adequately caring for AR, and she had placed AR in danger by not providing proper nutrition or shelter.
A child in need of care proceeding shall be commenced by the filing of a petition by the district attorney or “any other person authorized by the court.” La. Ch.C. art. 631. The petition shall include the “[fjacts which show that the child is a child in need of care, including the acts or omissions of either parent which caused or contributed to the child’s condition.” La. Ch.C. art. 634 A(3). Once a petition is filed alleging that a child is in need of care, the State bears the burden of proving the allegations of the petition by a preponderance of the evidence. La. Ch.C. art. 665.
Louisiana Children’s Code article 606 sets forth the grounds on which a child can be found to be in need of care. Article 606 A provides as follows:
A. Allegations that a child is in need of care must assert one or more of the following grounds:
(1) The child is the victim of abuse perpetrated, aided, or tolerated by the parent or caretaker, and his welfare is seriously endangered if he is left within the custody or control of that parent or caretaker.
(2) The child is a victim of neglect.
(3) The child is without necessary food, clothing, shelter, medical care, or supervision because of the disappearance or prolonged absence of his parent or when, for any other reason, the child is placed at substantial risk of imminent harm because of the continuing absence of the parent.
(4) As a result of a criminal prosecution, the parent has been convicted of a crime against the child who is the subject of this proceeding, or against another child of the parent, and the parent is now unable to retain custody or control or the child’s welfare is otherwise endangered if left within the parent’s custody or control.
(5) The conduct of the parent, either as principal or accessory, constitutes a crime against the child or against any other child of that parent.
|inFurther, Article 606 B mandates: “A child whose parent is unable to provide basic support, supervision, treatment, or services due to inadequate financial re *1079 sources shall not, for that reason alone, be determined to be a child in need of care.” It is clear from this language that the Louisiana Legislature did not intend to allow a parent’s financial status to be the sole basis for a child in need of care adjudication. Thus, the State must be mindful of this provision before initiating a child in need of care petition.
In the instant case, the State’s petition conformed with the requirements of the Louisiana Children’s Code. As previously indicated, the State initially requested custody of AR based on a finding of lack of supervision, Article 606 A(3), and neglect, Article 606 A(2). “Neglect” is defined in La. Ch.C. art. 603(14) as “the refusal or willful failure of a parent or caretaker to supply the child with necessary food, clothing, shelter, care, treatment, or counseling for any injury, illness, or condition of the child, as a result of which the child’s physical, mental, or emotional health is substantially threatened or impaired.” The State’s petition regarding AR focused on appellant’s inability to provide for the child’s basic needs.
The trial court heard from various fact witnesses in this case regarding appellant’s history and the circumstances surrounding the State’s decision to take AR into custody. In determining that AR was a child in need of care, the trial court issued the following oral reasons for judgment:
I have learned enough that I see some things that I am displeased with. I, also, am experienced enough to know that sometimes, when you get into these proceedings where you have the Office of Community Services in your life, that you can drive a wedge between families. You can cause dissention and aggravation, a good case of the reds. And I think that’s the case on both maternal and paternal grandparents, and I am sorry for that. But because of all of those emotions, I heard testimony of [appellant], because when she gets mad with mom for telling her not to do something, she ups and moves out.
I have heard just enough that I am convinced by clear and convincing evidence, even more than the burden that is necessary in this case, to come to the conclusion that this is a child in need of care. You all have brought enough dirty linen against each other. You have spilled enough beans that says to me that this is a situation where I want 'the State of Louisiana involved in your life up to your necks, if you will. (Emphasis added.)
InBased on our review of the record in this case, we find that the evidence presented by the State falls short of satisfying the grounds for adjudication listed in Article 606 A(3). There was no evidence of any “prolonged absence” by appellant that led to AR being “placed at substantial risk of imminent harm.” Rather, what we have here is a case where AR is apparently a “victim of neglect” as defined in Article 603.
Appellant argues that pursuant to Article 606 B, her “instability” does not provide a sufficient basis for adjudicating AR as a child in need of care. While we agree that appellant’s “instability” alone would not be sufficient grounds for the State to prevail in this adjudication, the record reveals that the trial court had before it enough evidence to conclude that AR was a child in need of care. The evidence shows a repeated pattern of appellant placing AR at risk by willfully and voluntarily leaving her mother’s home and exposing AR to a lack of adequate shelter. Appellant’s mother clearly testified that she did not force appellant out of her home, but that appellant chose to leave because she did not like the rules. We recognize the tenuous nature of the State’s argument that appellant’s neglect of AR was sufficient to warrant her removal from the home and the subsequent adjudication of AR as a child in need of care. However, because of our role as an appellate court and our inability to judge the credibility of the witnesses, we find no abuse of discretion by the trial court in determining *1080 that the State met its burden of proving that AR is a child in need of care. Thus, we cannot disturb the trial court’s decision. Appellant’s first assignment of error is without merit.
Dispositional Alternatives:
In her second assignment of error, appellant complains that the trial court’s disposition was not the least restrictive disposition based on the circumstances of the ease, the needs of the child and the best interest of society. Opposing counsel argue the placement of AR with the paternal grandmother was appropriate and the least restrictive alternative available. We agree.
We recognize that the removal of a child from his/her parents’ custody is one of the “extraordinary procedures established by law” and “meant to be used only when | ^required by necessity and then with due respect for the rights of the parents, the children, and the institution of the family.” See La. Ch.C. art. 101. However, pursuant to La. Ch.C. art. 682, removal is warranted when a child’s welfare cannot be adequately safeguarded without .such removal. Article 682 further provides that when a child is to be removed from the parental home, the court must determine whether the State “has made reasonable efforts ... to prevent or eliminate the need for removal of the child from his home and, after removal, to make it possible for the child to return home.” The pertinent sections of La. Ch.C. art. 681 provide that once a trial court has adjudicated a child in need of care, it may “place the child in the custody of a parent or such other suitable person on such terms and conditions as deemed in the best interest of the child” or “in the custody of a private or public institution or agency.” Thus, if the trial court determines that removal of a child from his/her parents’ custody is necessary and that the State has complied with Article 682, the child will be placed according to Article 681.
In the instant case, the State explored its options with regard to family placements of AR and determined that it was in AR’s best interest that she be placed with her paternal grandmother. After adjudicating AR to be a child in need of care, the trial court continued custody with the State and maintained the placement with the paternal grandmother. The record is clear that the State conducted an investigation into the homes of both the paternal grandmother and maternal grandmother before reaching this conclusion regarding placement of AR. Furthermore, the State, through its family services unit, attempted to work with appellant for approximately one month to prevent the need for removal of AR from appellant’s custody. Appellant was given an opportunity to get her life in order, but instead, failed to cooperate with the State in this regard. In fact, when AR was initially taken into custody by the State, appellant admitted to one of the State’s workers that she could not parent AR at that time because she did not have a stable place to live and was not employed.
Based on our review of the record, we find nothing inappropriate about the placement of AR with her paternal grandmother. When compared to the other options set forth in Article 681, i.e., placement of AR in the custody of a non-relative foster family |1sor a private or public institution or agency, placement of AR in the custody of her paternal grandmother is the least restrictive and most appropriate alternative available. Both appellant and AR’s father have liberal visitation with AR and are currently working with the State on a case plan that could ultimately result in reunification of the family. We believe that this liberal visitation between AR and her parents should continue while the State works toward the goal of reunification. This assignment of error lacks merit.
CONCLUSION
For the foregoing reasons, the trial court’s decision adjudicating AR to be a *1081 child in need of care is affirmed in all respects. Costs of this appeal are assessed against appellant.
AFFIRMED.
LeBLANC, J., concurs.